# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs February 25, 2014

## STATE OF TENNESSEE v. ANTHONY XEN MAPLES

### Appeal from the Criminal Court for Knox County
### No. 98124    Steven Sword, Judge

### No. E2013-00961-CCA-R3-CD - Filed March 18, 2014

The defendant, Anthony Xen Maples, appeals his Knox County Criminal Court jury conviction of second offense driving under the influence ("DUI"), claiming that the evidence was insufficient to support his conviction and that the fine imposed by the trial court was excessive. Discerning no error, we affirm.

### Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and D. KELLY THOMAS, JR., J., joined.

Kathryn Merwald and Robert C. Edwards, Assistant District Public Defenders, for the appellant, Anthony Xen Maples.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Jamie Carter, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

A Knox County Criminal Court jury convicted the defendant of one count of DUI related to an August 25, 2010 vehicle accident and further determined that this was the defendant's second offense of DUI.

At trial, Knox County Sheriff's Office ("KCSO") Deputy Chris Lougheed testified that, on August 25, 2010, he arrived at the scene of a single vehicle car accident to find "a white Chevy pickup . . . parked into the back of a mailbox" and the defendant "leaning against the truck." Deputy Lougheed stated that he "could not . . . figure out how

. . . the truck ended up crashing into that mailbox." He then approached the defendant, whom he described as "very unsteady on his feet," and noticed that the defendant "smelled of alcohol, had slurred speech, had real trouble communicating with me and was using the truck for balance." The defendant admitted having driven the truck. Deputy Lougheed said that he asked the defendant, who also had "bloodshot eyes," "'How drunk are you?'" The defendant "replied that he was not drunk; he had cancer."

Deputy Lougheed recalled that he asked the defendant to perform the horizontal gaze nystagmus, the walk and turn, and the one-legged stand tests at the accident scene, which the deputy described as "relatively flat." Deputy Lougheed reported that the defendant was unable "to keep his head still" during the horizontal gaze nystagmus test, which rendered the results of that test unusable. He said that when he asked the defendant whether the defendant suffered from any eye problems that might interfere with the test, the defendant "stated 'viscosity'" but could not explain what he meant by the term. During the one-legged stand test, "within the first ten seconds, [the defendant] picked his foot up, set it down multiple times, didn't really count out loud, and then told [Deputy Lougheed] he couldn't do it." During the walk-and-turn test, the defendant "couldn't stay where he was" and eventually "said he could not do it because he had been drinking too much."

At that point, Deputy Lougheed placed the defendant under arrest. During an inventory search of the defendant's vehicle, officers discovered "a bottle of rum and a bottle of vodka," one of which had been opened. Deputy Lougheed read to the defendant the implied consent form and asked the defendant to submit to blood alcohol testing. Deputy Lougheed explained that the KCSO did not use breathalyzers or urine tests to determine blood alcohol concentration and that "the only option" they used was "the blood test." The defendant refused to submit to the test. Deputy Lougheed said that based upon his "training and experience" and his observations at the scene, including his interaction with the defendant and the defendant's inability to perform the field sobriety tests, it was his opinion that the defendant "was intoxicated over the legal limit."

Portions of the video recording made from Deputy Lougheed's cruiser camera were played for the jury.

During cross-examination, Deputy Lougheed acknowledged that he asked the defendant, "'How drunk are you?'" within one minute of his arrival at the accident scene. Deputy Lougheed agreed that medical conditions "could have an effect on all three" field sobriety tests. He said that, for this reason, he typically asks whether a suspect suffers from a medical condition that might affect the suspect's performance on the test. He agreed that he had not asked that question of the defendant. He added, however, that the defendant did not volunteer any information regarding any medical conditions, even when Deputy

-2-

Lougheed "mentioned going to the hospital." He conceded that the defendant mentioned being "under medication" and that the defendant "said something about cancer." Deputy Lougheed acknowledged that the defendant mentioned having "physical problems" during Deputy Lougheed's reading of the implied consent form.

Following Deputy Lougheed's testimony, the State rested.

Jonathan Holloway testified on behalf of the defendant that the defendant helped Mr. Holloway move on August 25, 2010. Mr. Holloway said that the two men worked from approximately 8:00 a.m. until "almost dark." They took only a single break to eat lunch, at which time Mr. Holloway consumed one beer, and the defendant consumed "half a can" of beer. Mr. Holloway said that the defendant "wasn't feeling good" when he left, so Mr. Holloway asked the defendant to call him when he reached his home. When the defendant did not call, Mr. Holloway tried to call the defendant. He said that he had left his medication and "a couple bottles of alcohol" in the defendant's truck. Mr. Holloway could not recall what kind of alcohol he had left in the defendant's truck, but he did remember that he "took a swig out of" one of the bottles earlier on August 25, 2010. Mr. Holloway maintained that the defendant was not intoxicated when Mr. Holloway last saw him just before dark on August 25, 2010.

During cross-examination, Mr. Holloway said that he could not recall the date when the defendant helped him move. He also testified that he and the defendant worked for "three or four hours" after lunch and then decided to quit. He said that although he could not recall the time that the defendant left, "[i]t was getting dark when he left."

The 51-year-old defendant testified that he "was feeling really bad" when he left Mr. Holloway's house due to his "medical issues." For this reason, he "was trying to get home" when he started "to feel kind of clammy and cold, just feeling weird." He said that he then noticed that his "hands and . . . feet weren't working" and that he "couldn't hardly move [his] tongue." He said, "I'm pretty close to my mother and father's house, and there's like three really sharp curves around through there right before you get to my mom and dad's house, and I started . . . seeing things really blurry." The defendant said that his "motor skills were really messed up" and that he "felt like [he] was going to black out." He testified that he "pulled over into a subdivision . . . and shut [his] vehicle off and got out of the vehicle and sat down." He claimed that he "blacked out pretty much . . . for a few . . . seconds, and [his] truck rolled back" because he had failed to properly set the parking brake.

The defendant said that, during the field sobriety tests, he felt as though he would "fall down" because there "was just like a lot of pressure on him." He said that he could not complete the tests because "there was something wrong" with him and he "didn't

really know what caused all that stuff." The defendant claimed that he told Deputy Lougheed that he had consumed "too much" alcohol because he "figured they'd take [him] to the hospital to try to check out [his] condition." The defendant testified that he refused to allow his blood to be drawn for testing because he was "scared to death of needles."

The defendant admitted that he yelled and cursed at Deputy Lougheed because his "ankle got slammed in the door," the handcuffs were "so tight that it was cutting the circulation off" to his hands, and "the officer kept taunting" him about what would happen to his truck. The defendant said that he wanted the vehicle towed to his parents' house, but the officer refused. The defendant admitted that he drank part of a single can of beer with his midday meal, but he denied consuming any other alcoholic beverage that day. He said that he was not intoxicated at any point that day.

During cross-examination, the defendant said that the alcohol in his truck belonged to Mr. Holloway and that the bottles were "behind the seat" in an area that was not accessible to him as he drove. He claimed that he did not know the alcohol had been put into his truck. The defendant said that he did not feel well from the time he arrived to help Mr. Holloway move, claiming that he suffered from "[s]tomach problems," that he "was very fatigued," and that he "was real dry." The defendant said that he had "degenerative disc disease," "double strangulated hernia," "a spermatocele," and "periodontal disease." He stated that he was less than one-eighth of a mile from his house when he decided to pull over and that his truck rolled backwards into the mailbox. He could not recall whether he informed Deputy Lougheed that he was then experiencing serious medical issues during the field sobriety tests. He admitted that he did not ask to be transported to the hospital and that he made no complaint about his physical ailments save telling the officer that he had "medical problems."

At the conclusion of this testimony, the defense rested. The jury convicted the defendant, as charged, of DUI and violating the implied consent law. The trial court then submitted to the jury count three of the indictment, alleging that this offense was the defendant's second conviction of DUI. The jury found the defendant guilty of second offense DUI. Following a sentencing hearing, the trial court imposed a sentence of 11 months and 29 days to be served as 50 days' incarceration followed by probation. The trial court also imposed a $3,500 fine, as was recommended by the jury.

The defendant filed a timely but unsuccessful motion for new trial that challenged the sufficiency of the convicting evidence, the term of incarceration imposed by the trial court, and the imposition of the $3,500 fine given the defendant's indigence and inability to pay. In this timely appeal, the defendant again challenges the sufficiency of the convicting evidence and the imposition of the $3,500 fine.

-4-

*I. Sufficiency*

The defendant contends that the evidence was insufficient to support his conviction of DUI because the record established that the defendant's medical issues rather than his intoxication accounted for the vehicle accident and the defendant's physical condition as observed by Deputy Lougheed. He does not challenge the jury's finding that this was his second offense of DUI. The State asserts that the evidence was sufficient to support the conviction. We agree with the State.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case,

It is unlawful for any person to drive or to be in physical control of any automobile . . . on any of the public roads and highways of the state . . . while:

(1) Under the influence of any intoxicant, marijuana, controlled substance, drug, substance affecting the central nervous system or combination thereof that impairs the driver's ability to safely operate a motor vehicle by depriving the driver of the clearness of mind and control of himself which he would otherwise possess[.]

T.C.A. § 55-10-401(a)(1).

The evidence adduced at trial, when viewed in the light most favorable to the State, established that Deputy Lougheed responded to the scene of a single-vehicle accident to find the defendant's truck lodged against a mailbox at an awkward angle. Deputy Lougheed testified that the defendant smelled of an alcoholic beverage, was unsteady on his feet, had blood shot eyes, and spoke in a slurred manner. The defendant was unable to complete any of the field sobriety tests administered by Deputy Lougheed. Notably, the defendant admitted to the officer that he had consumed "too much" alcohol. Officers discovered an open bottle of liquor in the defendant's truck. Although the defendant maintained that it was his medical condition that occasioned both the accident and his disheveled appearance, the jury, as was its prerogative, rejected this testimony. We conclude that the evidence presented by the State was sufficient to support the defendant's conviction of second offense DUI.

## II. Fine

The defendant next contends that the trial court erred by imposing the $3,500 fine recommended by the jury without making a determination regarding the defendant's ability to pay. The State avers that the defendant has failed to demonstrate that the fine imposed by the trial court is excessive.

When an offense is punishable by a fine in excess of $50, it is the jury's responsibility to set a fine, if any, within the ranges provided by the legislature. *See* T.C.A. § 40-35-301(b). The trial court, in imposing the sentence, shall then impose a fine in an amount not to exceed the fine fixed by the jury. *See id.* This court reviews fines as a part of the sentence, *see State v. Bryant*, 805 S.W.2d 762, 767 (Tenn. 1991), and our standard of review is abuse of discretion, *see State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The trial court's imposition of a fine should be based upon the factors and principles of the 1989 Sentencing Act, such as prior history, potential for rehabilitation, financial means, and mitigating and enhancing factors relevant to an appropriate, total sentence. *See Bryant*, 805 S.W.2d at 766. Although the defendant's ability to pay is a factor for the trial court to weigh in reviewing the fine fixed by the jury, *see State v. Alvarado*, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996), it is not the controlling factor. "[A]n oppressive fine can disrupt future rehabilitation and prevent a defendant from becoming a productive member of society. . . . However, a significant fine is not automatically precluded just because it works a substantial hardship on a defendant - it may be punitive in the same fashion incarceration may be punitive." *State v. Marshall*, 870 S.W.2d 532, 542 (Tenn. Crim. App. 1993).

The defendant did not object to the fine when it was imposed at the sentencing hearing and neither party presented any proof regarding the defendant's ability to pay. At the hearing on the motion for new trial, defense counsel argued that his "various medical

conditions" prevented the defendant from working and that he derived his income from "disability." The defendant did not, however, support his claims by placing evidence in the record such as documentation of his meager income or sworn testimony that he simply could not pay. At the conclusion of the hearing, the trial court determined, without enumerating any specific factual findings, that the fine was "reasonable in this case." Because the trial court failed to make any specific factual findings before imposing the fine, the defendant asserts that we should review the issue de novo rather than for an abuse of discretion. In our view, under either standard of review, given the absence of any proof in the record regarding the defendant's ability to pay, the trial court did not err by imposing the $3,500 fine recommended by the jury.

*Conclusion*

The evidence was sufficient to support the defendant's conviction, and the fine imposed by the trial court was not excessive. Accordingly, the judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE